# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

Bryan Pittman,

     Plaintiff

v.

Las Vegas Metropolitan Police Department, et al.,

     Defendants

Case No.: 2:21-cv-01550-JAD-DJA

**Order Granting Motion for Summary Judgment and Closing Case**

[ECF No. 30]

Pro se plaintiff Bryan Pittman sues the Las Vegas Metropolitan Police Department (Metro) and its officers Stephen Wisniewski, Paul Lewis, Michael Schena, and Eddie Scott for violating his federal constitutional rights when they handcuffed him, conducted a pat-down, and searched his truck during a child-custody exchange. The defendants move for summary judgment on all claims, arguing that their conduct was lawful because they had reasonable suspicion that Pittman unlawfully possessed a firearm and probable cause that he was violating a temporary protective order and, regardless, they are spared from this suit by the doctrine of qualified immunity.

I grant summary judgment on all claims against Officer Schena because he did not personally participate in any of the alleged violations. I find that Pittman cannot support a municipal-liability claim against Metro, so I grant Metro judgment in its favor, too. And because Officers Wisniewski, Lewis, and Scott have shown that Pittman's claims against them fail either based on a lack of factual support in the record or qualified immunity—although their conduct was far from model—I grant their motion, enter summary judgment in their favor, and close this case.

## Background[1]

On September 5, 2019, Bryan Pittman called Metro's non-emergency line to request a police escort for a child-custody exchange with his ex-wife Cassandra,[2] as he had done several times before.[3]  He parked about 200 yards away from the Burger King where the 8:00 a.m. custody exchange was to take place and waited for the police to arrive.[4]  Minutes earlier, Cassandra's boyfriend had also called that same line to request assistance with the exchange.[5]  In that call, he informed dispatch that Pittman possessed a handgun that he kept in the center console of his vehicle.[6]

Though these custody exchanges were required as part of the couple's divorce proceedings, Cassandra had separately been granted a temporary protective order (TPO) against Pittman that prohibited "any contact whatsoever" with her and barred him from "threatening, physically injuring, or harassing" her through February 5, 2020.[7]  That TPO included an exception to the no-contact directive for custody exchanges performed at their daughter's school.[8]  And though an earlier TPO in effect from May 13, 2019, to June 17, 2019, included an

---

[1] Facts in this section are taken from Pittman's first-amended complaint, ECF No. 17; Wisniewski's body-camera footage, ECF No. 30-2 at 40; and the defendants' undisputed declarations and computer-aided dispatch reports, ECF No. 30-2 at 1–7, 49–51.  These facts are uncontested unless otherwise noted.

[2] I refer to Cassandra by her first name to distinguish her from Bryan because they have the same surname.  No disrespect is intended in doing so.

[3] ECF No. 17 at 3.  *See* ECF No. 30-1 at 15.

[4] ECF No. 17 at 3.

[5] *Id.* at 4.

[6] *Id.*

[7] ECF No. 30-2 at 10, 17–19 (protective order).

[8] *Id.* at 18–19.

exception for custody exchanges taking place at this Burger King,[9] the one in effect on this September morning was silent about the Burger King exception.

Officer Stephen Wisniewski arrived first at the scene with his field-training officer Paul Lewis and approached Cassandra and her boyfriend, who were parked in the Burger King lot.[10] They told Wisniewski that they had requested police assistance because the custody exchanges "usually go bad" and that Pittman "had been arrested twice" previously for violating a TPO.[11] Wisniewski returned to Lewis, informing him that Pittman "has a TPO out on him and a 413," which is Metro's internal code for a handgun.[12]  When officers Michael Schena and Eddie Scott arrived a few minutes later, Wisniewski told them, "I'm going to contact [Pittman], I'm going to have to take his 413 that he probably has per the details of the call because he has a TPO that's been served."[13]

Pittman steered his truck over to the officers and stepped out of the vehicle, where he was greeted by Wisniewski and asked to present his identification.[14]  After Pittman did so, Wisniewski informed him that he would be conducting a pat-down search for weapons.[15] Pittman protested, stating "no, I'm here to get my kids," and inquiring why the search was necessary.[16]  Wisniewski cuffed Pittman's hands behind his back and proceeded with the pat-down, while Schena told Pittman that they had information that he possessed a weapon in

---

[9] *Id.* at 21.

[10] ECF No. 30-2 at 0:00:33.

[11] *Id.* at 0:00:50–0:01:15.

[12] *Id.* at 0:02:15.  *See* ECF No. 17 at 4.

[13] ECF No. 30-2 at 0:05:35.

[14] *Id.* at 0:06:10.

[15] *Id.* at 0:06:19.

[16] *Id.* at 0:06:25.

violation of his TPO.[17]  After Wisniewski completed the pat-down, another officer informed Pittman that they needed to conduct a protective frisk of his vehicle, to which he responded, "I don't give you permission to go in my car."[18]  Wisniewski went to search Pittman's vehicle but, upon finding that it was locked, retrieved Pittman's car keys from his pocket at Lewis's direction,[19] and then searched the driver and passenger compartments of the truck, including the center console and glovebox.[20]  During this time, Officer Scott held Pittman by the arm.[21] Wisniewski found no weapons or contraband in Pittman's car.[22]

Pittman then requested that the handcuffs be removed and asked if he was under arrest; Wisniewski answered no to both inquiries.[23]  Wisniewski explained that Pittman was initially placed in cuffs for refusing to submit to a pat-down, and the restraints would stay on because he was "being hostile with officers, so I don't know what your intent is, because normal citizens don't talk back like this."[24]  Pittman again pressed Wisniewski to explain why he was still restrained, and the officer responded that "the behavior that you've just showed us today tells me, from my experience, that you're likely to fight with officers, and that's why you're in handcuffs."[25]  Having determined that it was safe to proceed with the custody exchange, Wisniewski approached Cassandra and directed her to drive over to Pittman's truck and place the

---

[17] *Id.* at 0:06:41; ECF No. 17 at 13.

[18] ECF No. 30-2 at 0:07:37.

[19] ECF No. 17 at 5.

[20] ECF No. 30-2 at 0:08:12–0:11:54.

[21] ECF No. 17 at 6.

[22] ECF No. 30-2 at 0:12:03.

[23] *Id.* at 0:12:06.

[24] *Id.* at 0:13:00.

[25] *Id.* at 0:13:17–24.

child inside.[26]  In order to run the air-conditioning inside Pittman's vehicle so that his daughter would not have to sit inside a hot car, Wisniewski retrieved Pittman's keys from his pocket a second time, unlocked the truck, started it, and turned on the air conditioning.[27]  But when Cassandra placed the child inside Pittman's truck, he protested, "I don't give her permission to go in my vehicle."[28]  So Wisniewski instructed Cassandra to remove the child from Pittman's truck.[29]  Scott then removed the handcuffs from Pittman so that he could retrieve his daughter from Cassandra.[30]

Pittman filed this suit against Metro, Wisniewski, Lewis, Schena, and Scott for violating his Fourth Amendment rights and falsely arresting him.[31]  In his operative pleading, Pittman theorizes that the officers acted unlawfully when they handcuffed, detained, searched, and falsely arrested him; twice obtained Pittman's keys from his pocket; and searched his truck without a warrant.[32]  The defendants now move for summary judgment on all claims, contending that the record doesn't support any violations of Pittman's constitutional rights and that, even if it did, qualified immunity shields them from liability.[33]  Pittman opposes the motion, arguing that the officers acted unreasonably and violated his rights by arresting and searching him without justification.[34]

---

[26] *Id.* at 0:14:25.

[27] *Id.* at 0:17:02–0:17:22.

[28] *Id.* at 0:17:30.

[29] *Id.* at 0:17:44.

[30] *Id.* at 0:18:30–0:19:00; ECF No. 17 at 10.

[31] ECF No. 1.

[32] *See* ECF No. 17 at 12–14 (first-amended complaint).

[33] ECF No. 30.

[34] ECF No. 36.

**Discussion**

**I.   To prevail on summary judgment, the defendants must show that the record presents no genuine dispute of material fact and that they are entitled to judgment as a matter of law.**

The principal purpose of the summary-judgment procedure is to isolate and dispose of factually unsupported claims or defenses.[35]  The moving party bears the initial responsibility of presenting the basis for its motion and identifying the portions of the record or affidavits that demonstrate the absence of a genuine issue of material fact.[36]  If the moving party satisfies its burden with a properly supported motion, the burden then shifts to the opposing party to present specific facts that show a genuine issue for trial.[37]  Defendants moving for summary judgment don't have to produce evidence to negate the plaintiff's claim; they merely have to point out the absence of a genuine material factual issue.[38]  The defendants need only defeat one element of a claim to garner summary judgment on it because "a complete failure of proof concerning an essential element of [a plaintiff's claim] necessarily renders all other facts immaterial."[39]

**II.   Pittman's claims against Officer Schena fail as a matter of law because Schena did not personally participate in any of the alleged violations.**

Pittman theorizes that Officer Schena violated his constitutional rights by "claiming that [Pittman's possession of] a firearm was a violation of a TPO order" and "attempting to convince" other officers that he "had violated a TPO order by being present" at the Burger King

---

[35] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

[36] *Celotex*, 477 U.S. at 323; *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc).

[37] Fed. R. Civ. P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Auvil v. CBS 60 Minutes*, 67 F.3d 816, 819 (9th Cir. 1995).

[38] *See, e.g., Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 885 (1990); *Celotex*, 477 U.S. at 323–24.

[39] *Celotex*, 477 U.S. at 322.

for the custody exchange.[40]   Both parties appear to agree that Schena did not otherwise

personally participate in Pittman's detention or pat-down or the search of his vehicle.   But even

assuming Schena misrepresented to Pittman and others the TPO's prohibitions on him, that act

does not support a finding that Schena personally violated Pittman's Fourth Amendment rights,

as the law requires to sustain this claim, because a defendant is liable under 42 U.S.C. § 1983

"only upon a showing of [his] personal participation."[41]   So I grant Schena summary judgment

on all claims against him.[42]

### III.   The record does not support municipal liability against Metro for the constitutional violations that Pittman claims.

Pittman names Metro as a defendant based on two factual theories: (1) it acknowledged

in an internal-affairs-investigation letter that Officer Lewis violated Metro policy, and (2) Metro

engages in biased policing because these officers relied on a phone tip from an "uncredible

witness."[43]   The United States Supreme Court held in *Monell v. Department of Social Services of

the City of New York* that a municipal entity like Metro can be held liable for the constitutional

violations of an officer only if the violations occurred because the officer was carrying out a

---

[40] ECF No. 17 at 7, 13–14.

[41] *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).

[42] In Pittman's opposition to the defendants' summary-judgment motion, he also argues that Schena "as well as other officers on scene had a duty to intervene when [Pittman's] rights . . . were violated."  ECF No. 36 at 4.  But no duty-to-intervene claim was plead in Pittman's complaint.  A plaintiff cannot assert entirely new claims for the first time in an opposition to summary judgment.  *See Pickern v. Pier 1 Imports (U.S.), Inc.*, 457 F.3d 963, 968 (9th Cir. 2006) (holding that the defendant lacked adequate notice of the plaintiff's new ADA claims raised for the first time in opposition to summary judgment); *see also* Fed. R. Civ. P. 8(a)(2) (requiring a plaintiff to include "a short and plain statement of the claim showing that the pleader is entitled to relief").  So I disregard the arguments regarding this new duty-to-intervene claim.

[43] ECF No. 36 at 7, 11, 20.

municipal policy or custom.[44]  But Pittman doesn't contend that the officers were implementing a Metro policy or custom.  He relies primarily on the organization's finding that Officer Lewis violated Metro Policy Number 5/200.01.[45]  Because *Monell* liability attaches only when an officer is *executing* a municipal policy or custom,[46] Pittman cannot rely on Lewis's *violation* of a policy to support a § 1983 claim against Metro.

Pittman's theory that these officers' reliance on "the word of a completely uncredible witness" shows that the organization is "policing its citizens with a 'scope' based on [unreliable] opinions" likewise fails to show municipal liability because Pittman identifies just one instance of this conduct,[47] and a single violation of municipal policy is insufficient to establish *Monell* liability.  The Supreme Court held in *City of Oklahoma City v. Tuttle* that "proof of a single incident of unconstitutional activity is not sufficient to impose [municipal] liability[;] . . . the existence of [an] unconstitutional policy, and its origin, must be separately proved."[48]  Because neither of Pittman's theories against Metro is legally viable, I grant summary judgment in favor of Metro on all claims against it.

---

[44] *Long v. Cnty. of Los Angeles*, 442 F.3d 1178, 1185 (9th Cir. 2006) (citing *Monell*, 436 U.S. at 690).

[45] ECF No. 36 at 11 (Metro's answers to Pittman's interrogatories), 20 (internal-affairs letter). The defendants dispute the admissibility of the internal-affairs-investigation letter based on Federal Rule of Evidence 407.  ECF No. 29 at 3.  But because the letter, even if admitted, would not establish a basis for Metro's liability, I do not reach the defendants' evidentiary argument.

[46] *Long*, 442 F.3d at 1185.

[47] ECF No. 36 at 7.

[48] *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823–24 (1985); *but see Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986) (holding that "a municipality may be liable under § 1983 for a single decision by its properly constituted *legislative* body . . . ." (emphasis added)).

**IV.     The record does not support any claims against Officers Wisniewski, Lewis, or Scott in their individual capacities.**

Officers Wisniewski, Lewis, and Scott are entitled to summary judgment on Pittman's claims against them because either he cannot show that they violated his constitutional rights or the officers are protected from liability by qualified immunity.  Pittman theorizes that his Fourth Amendment rights were violated when Wisniewski conducted a pat-down, detained, and handcuffed him with "no immediate or articulable threat to the officers"; Scott continued to hold Pittman in handcuffs "even after the facts and circumstances dispelled any suspicions or hunches" that he was violating the law; and Wisniewski removed car keys from Pittman's pocket and searched his car without consent.[49]  He claims that his detention and Scott's "holding him with a tight grip" constituted a false arrest and false imprisonment.[50]  Pittman alleges that Lewis was the "leader of the gang" who "ordered Wisniewski to illegally remove the keys from . . . Pittman's shorts" in violation of his Fourth Amendment rights.[51]

These remaining defendants contend that none of these facts give rise to a constitutional violation because the restraint, pat-down, and vehicle search were justified by their reasonable suspicion that Pittman unlawfully possessed a firearm.[52]  And while they contend that their restraint of Pittman did not rise to an arrest, they aver that they had probable cause to arrest him nevertheless.[53]  Finally, the defendants argue that, even if they did violate Pittman's rights, they

---

[49] ECF No. 17 at 12.

[50] *Id.*

[51] *Id.* at 14.

[52] ECF No. 30 at 14–23.

[53] *Id.* at 25.

1   are shielded from liability by the doctrine of qualified immunity.[54]   Because each phase of this

2   custody exchange presented unique constitutional concerns, I address each phase separately and

3   in the order in which they unfolded.

4   **A.      Officer Wisniewski had reasonable suspicion to detain Pittman.**

5          Pittman claims that Wisniewski violated his constitutional rights when he "illegally

6   detained" him at the start of the custody exchange.[55]   In *Terry v. Ohio*, the Supreme Court

7   sanctioned "limited police intrusions on a person's freedom of movement and personal security

8   when an officer's suspicion falls short of the 'probable cause' required to execute an arrest or a

9   'full' search."[56]   When initiating a *Terry* stop and investigating potential criminal activity, an

10  officer "must have reasonable suspicion to believe 'criminal activity may be afoot.'"[57]

11  Reasonable suspicion is objective and requires the officer to "point to specific and articulable

12  facts [that], taken together with rational inferences from those facts, reasonably warrant that

13  intrusion."[58]

14         Wisniewski contends that the initial detention of Pittman was justified by a reasonable

15  suspicion that he was engaged in a crime: the illegal possession of a firearm.[59]   Pittman responds

16  that such possession could not have formed the basis for his detention because "having a

17  handgun in the center console of your vehicle is not a crime in Nevada."[60]   He adds that the TPO

18

_____

19  [54] *Id.* at 8–11.

20  [55] ECF No. 17 at 7.

    [56] *Thomas v. Dillard*, 818 F.3d 864, 874 (9th Cir. 2016) (quoting *Terry v. Ohio*, 392 U.S. 1, 20–
21  21 (1968)).

    [57] *Id.*
22
    [58] *Terry*, 392 U.S. at 21.

23  [59] ECF No. 30 at 15.

    [60] ECF No. 17 at 4.

did not prohibit him from possessing a firearm because the judge who issued the order "did not

see fit to put that restriction" on him.[61]

In fact, however, Pittman was prohibited from possessing a firearm under both federal

and state law.  As the defendants note,[62] 18 U.S.C. § 922(g)(8) prohibits anyone who is subject

to a court order that "restrains such person from harassing, stalking, or threatening an intimate

partner of such person" from possessing "any firearm or ammunition."[63]  And Nevada law bars

anyone "otherwise prohibited by federal law from having a firearm in his" possession.[64]

Because the TPO prohibited Pittman "from threatening, physically injuring, or harassing" his ex-

wife, both of these laws restricted him from possessing a firearm on the day of the custody

exchange.[65]  Thus, the boyfriend's telephoned report that Pittman had a handgun in his truck's

center console gave the officers reasonable suspicion that criminal activity was afoot, justifying

Pittman's initial *Terry* detention.

### B. Officer Wisniewski's pat-down and handcuffing of Pittman and the search of his truck were justified by a reasonable suspicion that Pittman was armed and dangerous.

#### 1. *Pittman cannot show that the pat-down violated his constitutional rights.*

After the initial *Terry* stop, Wisniewski conducted a pat-down of Pittman for weapons—a

maneuver known as a *Terry* frisk.  Pittman claims that this *Terry* frisk was an unconstitutional

search.[66]  Wisniewski avers that it was supported by his reasonable suspicion that Pittman was

---

[61] *Id.* at 6.

[62] ECF No. 30 at 15.

[63] 18 U.S.C. § 922(g)(8).

[64] Nev. Rev. Stat. § 202.360(g).

[65] ECF No. 30-2 at 10.

[66] ECF No. 17 at 5.

armed and dangerous because (1) Pittman "had a history of violent behavior/crimes"; (2) "there was a TPO against [him] and the contents of the TPO"; (3) "he had been previously arrested in violation of his TPO"; (4) he "possessed a firearm"; (5) he had "bulges in his pockets"; (6) "when confronted about a pat-down, [he] grew hostile and agitated."[67]

To perform a *Terry* frisk, an officer must have "reasonable suspicion that a suspect 'is armed and presently dangerous.'"[68]  A "mere 'inchoate and unparticularized suspicion or hunch'" that a person is armed and dangerous does not establish reasonable suspicion.[69]  When assessing reasonable suspicion, courts give considerable deference to the observations and conclusions of officers, recognizing that an officer's training and experience allows him to make "inferences and deductions that might well elude an untrained person."[70]

Pittman challenges Wisniewski's assertion that there was a bulge in his pockets, stating that he "had nothing in his pockets" and that the bulge justification "was a lie made up to cover the rights violations."[71]  Courts "have given significant weight to an officer's observation of a visible bulge in an individual's clothing that could indicate the presence of a weapon."[72]  For example, in *United States v. Hill*, the Ninth Circuit panel concluded that an officer had reasonable suspicion to raise a suspect's shirt to search his waistband after that officer noticed a large bulge that he suspected was caused by a weapon.[73]  The panel found that the proximity of

---

[67] ECF No. 30 at 19; ECF No. 30-2 at 1–3 (Wisniewski's declaration).

[68] *Thomas*, 818 F.3d at 876.

[69] *Maryland v. Buie*, 494 U.S. 325, 332 (1990) (quoting *Terry*, 392 U.S. at 27) (some internal quotation marks omitted).

[70] *United States v. Cortez*, 449 U.S. 411, 418 (1981).

[71] ECF No. 36 at 5.

[72] *United States v. Flatter*, 456 F.3d 1154, 1157 (9th Cir. 2006) (collecting cases).

[73] *United States v. Hill*, 545 F.2d 1191, 1192–93 (9th Cir. 1976).

the search to the scene of a robbery, combined with the officer's observation of the bulge, gave him reasonable suspicion to conduct "a direct and specific inquiry" for weapons.[74]  Here, Wisniewski's observation of a bulge in Pittman's pockets and his knowledge that Pittman possessed a firearm, had a violent criminal record, was meeting the protected parties of a TPO issued against him, and had previously violated that TPO gave Wisniewski reasonable suspicion that Pittman was likely to be armed and dangerous.[75]  Wisniewski was thus justified in conducting a "direct and specific" protective frisk for weapons.[76]

Pittman also contends that Wisniewski had no reasonable suspicion to believe that he was armed and dangerous because Pittman himself had also called the police to facilitate the custody exchange, and he never resisted officers.[77]  But even if Pittman wasn't resisting, compliance is not a bar to this protective search.  So long as Wisniewski had a reasonable suspicion to believe that Pittman was armed and dangerous, he was permitted to conduct a *Terry* frisk.

Pittman further argues that the phone call report that he had a weapon in his vehicle was made by an untrustworthy third-party source, so the officers could not have relied on that call to establish reasonable suspicion that Pittman was armed.[78]  He alleges that the tip was "baseless" because Cassandra's boyfriend who made the call "had never been around [Pittman] or in [his] vehicle at any point" making "it impossible . . . to claim that [Pittman] was carrying a weapon."[79]

---

[74] *Id.* at 1193.

[75] ECF No. 30 at 19; ECF No. 30-2 at 1–3.

[76] *Hill*, 545 F.2d at 1193.

[77] ECF No. 36 at 4.

[78] *Id*. at 3.

[79] *Id.*

For an officer to conduct a *Terry* frisk based on a phone tip, the call must have "sufficient 'indicia of reliability.'"[80]  Instructive here is the Ninth Circuit's analysis in *United States v. Terry-Crespo*,[81] in which a man called 911, reported that he had been threatened with a handgun, and provided a location and description of the suspect.[82]  As a result of that tip, officers arrived at the given location, stopped a man matching the description, and conducted a pat-down search that revealed a weapon.[83]  The Ninth Circuit panel found that the call had "sufficient indicia of reliability to support a reasonable suspicion justifying the *Terry* stop" because there were physical records of the 911 call—an audio recording and transcript—and the call "was not anonymous and therefore was entitled to greater reliability."[84]  The panel contrasted its facts with those in *Florida v. J.L.*, in which an anonymous tipster reported "general criminal behavior" that a minor was carrying a firearm in violation of state law, leading to a *Terry* stop and frisk.[85]  The Supreme Court held in *J.L.* that the call could not support reasonable suspicion that the suspect was armed because the informant was anonymous, there was no documentation of the call in the record, and the caller had dialed the police department rather than 911.[86]

---

[80] *United States v. Terry-Crespo*, 356 F.3d 1170, 1173 (9th Cir. 2004) (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)).

[81] *Id.*

[82] *Id.* at 1172.

[83] *Id.* at 1172–73.

[84] *Id.* at 1174.

[85] *Id.* at 1176; *Florida v. J.L.*, 529 U.S. 266 (2000).

[86] *J.L.*, 529 U.S. at 268.

Our facts more closely mirror those in *Terry-Crespo*.  The tipster here was not anonymous,[87] so the call was "entitled to greater reliability."[88]  And unlike in *J.L.*, there is at least some evidence in the form of a computer-aided dispatch report that the call took place.[89] Plus, the tipster provided the specific facts that Pittman's gun was located in the center console of his truck and that such possession was illegal because he was bound by a TPO.[90]  Those details made this tip more reliable than a report of "general criminal behavior."[91]  And while, like in *J.L.*, this tip was phoned in to the non-emergency line rather than 911, I find that the known identity of the caller, the inclusion of specific facts of criminality, and evidence of the call in the record support the finding that this tip was reliable.  Wisniewski thus reasonably relied on the tip to form a reasonable suspicion that Pittman was armed and dangerous, so Wisniewski is entitled to summary judgment on Pittman's Fourth Amendment claim arising from the pat-down search.

### 2.    *Officer Wisniewski's initial use of handcuffs on Pittman did not violate his Fourth Amendment rights.*

Pittman claims that Wisniewski and Scott's "use and/or continued or extended use of handcuffs" on him during the *Terry* stop also violated his constitutional rights.[92]  He theorizes that Wisniewski's stated reason—"normal citizens don't talk back like this"—doesn't justify his

---

[87] ECF No. 17 at 4.  Though the defendants do not explicitly identify the caller, they do not dispute this fact in their briefing.

[88] *Terry-Crespo*, 356 F.3d at 1174.

[89] ECF No. 30-2 at 49 (exhibit J).

[90] ECF No. 30 at 19; ECF No. 30-2 at 1–3.

[91] *Terry-Crespo*, 356 F.3d at 1176.

[92] ECF No. 17 at 12.

handcuffing and continued detention after the pat-down search revealed no weapons.[93] Wisniewski and Scott contend that the handcuffing was justified because Pittman "was clearly hostile and angry about the idea of a pat-down," "refused to walk towards the vehicle when asked by . . . Wisniewski," had a "history of violent behavior," and presented a "further safety concern" because "Cassandra and the child were in the parking lot."[94]

"Police officers are entitled to employ reasonable methods to protect themselves and others in potentially dangerous situations."[95]  Because "handcuffing substantially aggravates the intrusiveness of an otherwise routine investigatory detention," it "is not part of a typical *Terry* stop,"[96] so the use of handcuffs "during an investigatory detention 'must be justified by the circumstances.'"[97]  Handcuffing is permitted only in "special circumstances, such as (1) where the suspect is uncooperative or takes action at the scene that raises a reasonable possibility of danger or flight; (2) where the police have information that the suspect is currently armed; (3) where the stop closely follows a violent crime; and (4) where the police have information that a crime that may involve violence is about to occur."[98]

The first and second scenarios justified Pittman's handcuffing.  Pittman refused to cooperate with the pat-down, and the officers had credible information that he had a gun in the

---

[93] *Id.* at 7 ("Wisniewski told [Pittman] that due to his behavior of accusing officers of unlawful acts, it is believed that [Pittman] will fight if removed from cuffs."); ECF No. 30-2 at 0:12:59.

[94] ECF No. 30 at 17.

[95] *Allen v. City of Los Angeles*, 66 F.3d 1052 (9th Cir. 1995) (citing *United States v. Jacobs*, 715 F.2d 1343, 1345–46 (9th Cir. 1983)).

[96] *United States v. Bautista,* 684 F.2d 1286, 1289 (9th Cir. 1982) (internal quotations removed).

[97] *Meredith v. Erath*, 342 F.3d 1057, 1062 (9th Cir. 2003) (quoting *Robinson v. Solano Cnty.*, 278 F.3d 1007, 1014 (9th Cir. 2002)).

[98] *Washington v. Lambert*, 98 F.3d 1181, 1189 (9th Cir. 1996).

truck.[99]  Instructive here is the Ninth Circuit's decision in *United States v. Bautista*, in which officers handcuffed two men suspected of armed bank robbery "for officer safety as a precaution."[100]  The panel concluded that "the initial handcuffing . . . was not excessive" because it was reasonable for the officers "to take adequate protective measures before remaining with two men suspected of armed bank robbery, particularly when the suspects appeared extremely nervous."[101]  Wisniewski and Scott had a reasonable suspicion that Pittman was armed and potentially dangerous, and they observed that Pittman was acting in a "hostile, agitated" manner that they feared could escalate to violence.[102]  These defendants were thus entitled to take adequate protective measures, so the handcuffing of Pittman during the pat-down and search of Pittman's truck was constitutionally appropriate.[103]

### 3.     The search of Pittman's truck was justified by Officer Wisniewski's reasonable suspicion that Pittman had a firearm in the center console.

Pittman next theorizes that his Fourth Amendment rights were violated when Wisniewski conducted a "warrantless search" of his car because the search was "not premised on probable cause or exigent circumstances."[104]  Wisniewski argues that he needed only a reasonable suspicion that Pittman had a weapon in the truck in order to search it and that, given Pittman's

---

[99] ECF No. 30 at 19; ECF No. 30-2 at 1–3.

[100] *Bautista*, 684 F.2d at 1288.

[101] *Id.* at 1289.

[102] ECF No. 30 at 23.  *United States v. Thompson*, 597 F.2d 187 (9th Cir. 1979).  Handcuffs were reasonably necessary in *Thompson* because the suspect had "repeatedly attempted to reach for his inside coat pocket, despite the officers' repeated warnings not to." *Id.* at 190.  *See also United States v. Purry*, 545 F.2d 217, 219-20 (D.C. Cir. 1976) (handcuffing of suspect permissible because the suspect "turned and pulled away" when the police officer placed an arm on him).

[103] ECF No. 30 at 19; ECF No. 30-2 at 1–3.

[104] ECF No. 17 at 7, 13.

17

1    "behavior, coupled with the TPO and information that he possessed a firearm in his vehicle,"

2    such suspicion existed.[105]  Wisniewski adds that a handgun was of particular concern here

3    because "the officers intended to allow [Pittman] to drive away with his daughter in the vehicle"

4    after the custody exchange was complete.[106]

5         The Supreme Court has held that police officers may search a vehicle for weapons during

6    a *Terry* stop if they have a reasonable suspicion "that the suspect is dangerous and the suspect

7    may gain immediate control of weapons."[107]  As with the reasonable-suspicion requirement for a

8    pat-down, the test "is whether a reasonably prudent man in the circumstances would be

9    warranted in the belief that his safety or that of others was in danger."[108]  If so, officers are

10   permitted "to conduct an area search of the passenger compartment to uncover weapons."[109]

11   This rule applies even if a suspect is "in the control" of officers during an investigative detention,

12   because "the suspect may be permitted to reenter the vehicle before the *Terry* investigation is

13   over and . . . have access to any weapons."[110]

14        The Supreme Court's decision in *Michigan v. Long* is a useful analogue.  In *Long*,

15   officers stopped a driver who was traveling erratically, conducted a pat-down search, and then

16   searched the car for weapons after observing a large hunting knife inside.[111]  The Court held that

17   the search of the passenger compartment was a lawful protective search under *Terry* because the

18

19   _____

20   [105] ECF No. 30 at 23.

     [106] *Id.*

21   [107] *Michigan v. Long*, 463 U.S. 1032, 1049 (1983).

     [108] *Terry*, 392 U.S. at 27.

22   [109] *Long*, 463 U.S. at 1051.

23   [110] *Id.* at 1052 (cleaned up).

     [111] *Id.* at 1035–36.

officers had "a reasonable belief that the suspect pose[d] a danger" due to his erratic driving and uncooperative behavior and that danger could "arise from the possible presence of weapons in the area surrounding a suspect."[112]  It added that the vehicle search was justified because the driver may have been "permitted to reenter the vehicle before the *Terry* investigation [was] over, and . . . [would have] access to weapons" inside.[113]

Here, officers stopped and conducted a pat-down search of Pittman based on reasonable suspicion that he was dangerous and illegally possessed a firearm.  While Wisniewski did not see a weapon in the car like the officer in *Long* did, he nevertheless had reasonable suspicion that a firearm was in Pittman's truck's center console based on the detailed phone tip and had reason to believe Pittman was dangerous because of his reported history of violence, the active TPO, and multiple prior violations of that TPO.[114]  Wisniewski also believed that the presence of a firearm in Pittman's car could pose a danger to the child during or after the custody exchange.[115]  So, like in *Long*, if Pittman were released and permitted to reenter his truck—which was likely given that the pat-down search revealed no weapons or contraband—he then would have had access to any weapons inside.[116]  Wisniewski's protective search of the vehicle was thus lawful under *Terry*.

---

[112] *Id.* at 1049.

[113] *Id.* at 1050.

[114] ECF No. 30 at 19; ECF No. 30-2 at 1–3.  Pittman argues that the defendants' claim that he has a history of violent behavior is false because "they have failed to show this lengthy violent record." ECF No. 36 at 6.  But the defendants note, and Pittman concedes, he had an active TPO based on allegations of domestic violence and that he had been arrested twice previously for violating that TPO.  ECF No. 30-1 at 7–12.

[115] ECF No. 30 at 23.

[116] *Id.  See also United States v. Griffin*, 589 F.3d 148, 154 (4th Cir. 2009), *cert denied*, 562 U.S. 1273 (2011) (holding that officers lawfully searched a *Terry* detainee's vehicle for weapons because the suspect, despite being detained in the back of a police vehicle during that search,

**C.      Officers Wisniewski and Scott had probable cause to arrest Pittman for violating the TPO.**

Pittman next alleges that his constitutional rights were violated when Wisniewski and Scott continued to detain him in handcuffs after they completed the pat-down and vehicle search because "no weapons were located on [his] person or inside his vehicle, [Pittman] made no furtive moves or otherwise attempted to flee, . . . and [there was an] overwhelming presence of law enforcement officers."[117]  Pittman also claims that his continued detention after the searches amounted to a false arrest because the officers lacked probable cause and that Scott's "holding him with a tight grip" constituted false imprisonment.[118]  Wisniewski and Scott argue that Pittman's continued detention was proper because he was "hostile and angry,"[119] the detention did not constitute an arrest, and regardless they had probable cause to arrest Pittman for violating the TPO.[120]

To prevail on a false-arrest claim, a plaintiff must "demonstrate that there was no probable cause to arrest [him]."[121]  "Probable cause exists when the facts and circumstances within the officer's knowledge are sufficient to cause a reasonably prudent person to believe that a crime has been committed."[122]  The "relevant inquiry is what the [officers] knew, collectively,

---

could have "been released after the brief detention, as he presumably would have been," and "he would have regained access to the vehicle and any weapon inside").

[117] ECF No. 17 at 8.

[118] *Id.* at 14.

[119] ECF No. 30 at 17.

[120] *Id.* at 25.

[121] *Norse v. City of Santa Cruz*, 629 F.3d 966, 978 (9th Cir. 2010) (quoting *Cabrera v. City of Huntington Park*, 159 F.3d 374, 380 (9th Cir. 1998)).

[122] *Lassiter v. City of Bremerton*, 556 F.3d 1049, 1053 (9th Cir. 2009) (citing *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979)).

at the time they arrested" the plaintiff.[123]  Probable cause only requires a "fair probability" that a crime occurred.[124]  And because Nevada law considers "false arrest [as] an integral part" of a claim for false imprisonment, I analyze these two claims together.[125]

Assuming without deciding that this continued detention was an arrest, it was lawful because the officers had probable cause to arrest Pittman for violating the TPO.  As Wisniewski and Scott argue, the "TPO expressly provided that [Pittman] could not have contact with" his ex-wife,[126] and the record supports this.  The TPO states that Pittman is "prohibited from any contact whatsoever with" his ex-wife.[127]  Pittman contends that, per the custody agreement under his divorce proceedings, he was "ordered to pick up the children at the Burger King by the same judge that granted the protective order" and was thus not in violation of the TPO that day.[128] That argument would have worked if this pickup had been three months earlier.  But the Burger King exception was only in effect until June 17, 2019.[129]  The TPO in effect at the time of this September 5, 2019, incident required that Pittman "stay 100 yards away from all locations the adverse party is excluded from in the" TPO and includes only a single exception for one of the

---

[123] *United States v. Collins*, 427 F.3d 688, 691 (9th Cir. 2005).

[124] *United States. v. Alaimalo*, 313 F.3d 1188, 1193 (9th Cir. 2002).

[125] *Hernandez v. City of Reno*, 634 P.2d 668, 671 (Nev. 1981) (citing *Marschall v. City of Carson*, 464 P.2d 494 (1970)).

[126] ECF No. 30 at 13 (citing ECF No. 30-2 at 9–15 (protective order), 21 (TPO extension to February 5, 2020)).

[127] ECF No. 30-2 at 10.

[128] ECF No. 36 at 2.

[129] ECF No. 30-2 at 19 (TPO extension to June 17, 2019).

children's schools.[130]  So the TPO in effect this day prohibited Pittman from making the Burger King exchange.[131]

Under Nevada law, a "person who intentionally violates . . . [a]n extended order and . . . [w]ho has previously violated an extended order two or more times is guilty of a category D felony."[132]  The record shows that Pittman had been arrested twice in August 2019 for violating the TPO.[133]  And Officers Wisniewski and Scott had reviewed the TPO prior to arriving on the scene and thus reasonably believed, based on available facts, that Pittman was violating the law by being present at the Burger King while his ex-wife was there.[134]  So I grant Wisniewski and Scott summary judgment on Pittman's false-arrest claim.  And because false arrest is "an integral part" of establishing false imprisonment under Nevada law,[135] I grant them summary judgment on the false-imprisonment claim, too.  Finally, I find that Wisniewski and Scott could lawfully handcuff Pittman even after the protective searches were completed because an arrest "necessarily carries with it the right to use some degree of physical coercion or threat thereof to

---

[130] ECF No. 30-2 at 21 (TPO extension to February 5, 2020).  And, presumably due to this incident, the extended TPO was later "amended to reflect the provisions specified in the divorce decree issued on August 28, 2019."  ECF No. 30-2 at 23.

[131] Pittman acknowledged as much in his deposition, stating that, under the August order, "the exchanges will now take place on Monday, one parent drop[s] off the kids at school, and the other parent pick[s] up the kids from school."  ECF No. 30-1 at 9, 14.

[132] Nev. Rev. Stat. § 33.100(2)(c).

[133] ECF No. 30-2 at 25–29 (declaration of arrest on April 10, 2019); 33–36 (declaration of arrest on August 23, 2019).

[134] *See* ECF No. 30-2 at 3 (Wisniewski's declaration).

[135] *Hernandez*, 634 P.2d at 671.

effect it,"[136] and probable cause continued to exist so long as Pittman was violating his TPO by being present at the Burger King.[137]

### G.   Officers Wisniewski and Lewis enjoy qualified immunity from claims arising from the retrieval of Pittman's keys from his pocket.

Finally, Pittman claims that Wisniewski conducted an illegal search when he, at Lewis's direction, twice reached into Pittman's pocket to retrieve his keys and unlock his truck.[138]  The defendants argue that this practice was not unconstitutional and, at a minimum, qualified immunity shields them from liability.[139]  Though Pittman does not respond to this argument directly in his opposition, he does claim that "the actions of the officers on the date in question were not those of any reasonable officer" because Pittman "had conducted multiple exchanges leading up to this day with [o]fficers present and never did officers deem it necessary to cuff and search the [plaintiff's] person or locked vehicle."[140]  Even if the liberties taken with Pittman's keys were unconstitutional, the officers are entitled to summary judgment on this final claim based on qualified immunity.

Qualified immunity protects government officials "from money damages unless a plaintiff pleads facts showing that (1) the official violated a statutory or constitutional right, and (2) the right was 'clearly established' at the time of the challenged conduct."[141]  The United States Supreme Court has warned lower courts to avoid addressing qualified immunity at a high

---

[136] *Graham v. Connor*, 490 U.S. 386, 396 (1989).

[137] *See* ECF No. 30-2 at 21.

[138] ECF No. 17 at 6.

[139] ECF No. 30 at 23–24.

[140] ECF No. 36 at 5.

[141] *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

level of generality,[142] and a defendant will be entitled to qualified immunity even if he was mistaken in his belief that his conduct was lawful, so long as that belief was reasonable.[143]  And it's the plaintiff who bears the burden of showing that the rights at issue were clearly established.[144]  Though the plaintiff need not identify a case "directly on point, existing precedent must have placed the statutory or constitutional question beyond debate."[145]  Because immunity is meant to protect "all but the plainly incompetent or those who knowingly violate the law,"[146] the Supreme Court has held that an officer is entitled to qualified immunity if he "reasonably believes that his . . . conduct complies with the law."[147]

Pittman has not met his burden to show that his right against these key shenanigans was clearly established such that no reasonable officer could believe that such conduct was unlawful. The closest Ninth Circuit case published by the time of the incident that involved an officer's retrieval of keys from a suspect's pockets was *United States v. Job*.[148]  In *Job*, the defendant sought to suppress evidence of illegal drugs after officers searched his pockets during a protective frisk and then used the car keys they found to unlock and search his vehicle.[149]  The

---

[142] *Saucier*, 533 U.S. at 201; *see also Sheehan v. Cty. of San Francisco*, 135 S. Ct. 1765, 1775–76 (2015); *Kisella v. Hughes*, 138 S. Ct. 1148, 1152–53 (2018).

[143] *Torres v. City of Madera*, 648 F.3d 1119, 1127 (9th Cir. 2011), *cert. denied*, 132 S. Ct. 1032 (2012) ("the clearly established prong concerns the reasonableness of the officer's mistake of law."); *Wilkins v. City of Oakland*, 350 F.3d 949, 955 (9th Cir. 2003); *Davis v. Scherer*, 468 U.S. 183, 191 (1984) ("Whether an official may prevail in his qualified immunity defense depends upon the objective reasonableness of his conduct as measured by reference to clearly established law." (cleaned up)).

[144] *Robinson v. York*, 566 F.3d 817, 826 (9th Cir. 2009).

[145] *Id.*

[146] *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

[147] *Pearson,* 555 U.S. at 244.

[148] *United States v. Job*, 871 F.3d 852 (9th Cir. 2017).

[149] *Id.* at 858.

Ninth Circuit panel held that all the evidence should have been suppressed because the officers lacked reasonable suspicion to conduct a protective sweep in the first place.[150]

The facts of *Job* are readily distinguishable from Pittman's. Unlike the officers in *Job*, Wisniewski and Lewis had reasonable suspicion to believe that Pittman was armed—or that he unlawfully possessed a firearm in the center console of his vehicle—and that he was dangerous.[151] And while the *Job* panel held that the evidence from the pat-down and car search had to be suppressed, it did not analyze the act of seizing the car keys from the defendant's pockets, so *Job* would not have put Wisniewski and Lewis on notice that retrieving and using Pittman's keys was unconstitutional.[152] Wisniewski and Lewis are therefore entitled to qualified immunity from Pittman's § 1983 claim based on the retrieval of car keys from his pockets, so I grant summary judgment in their favor on that claim, too.

**Conclusion**

IT IS THEREFORE ORDERED that the defendants' motion for summary judgment **[ECF No. 30] is GRANTED**. The **Clerk of Court** is directed to **ENTER FINAL JUDGMENT** in favor of the defendants on all claims and **CLOSE THIS CASE**.

_____
U.S. District Judge Jennifer A. Dorsey
August 26, 2023

---

[150] *Id.* at 860–62.

[151] *See supra* at pp. 11–15.

[152] Other Ninth Circuit cases involving pocket searches have dealt with those incident to arrests that were supported by probable cause. But those situations are distinguishable from the instant one because there was reasonable suspicion to search Pittman and his vehicle as part of a *Terry* frisk. *See, e.g., United States v. Moses*, 796 F.2d 281, 285 (9th Cir. 1986) (holding that officers' search of the arrestee's car using keys retrieved from his pockets was a search incident to a lawful arrest supported by probable cause).